FLORENCE BAXTER ET AL. v. THE BANK OF BELLE, OF BELLE, MARIES COUNTY ET AL., Appellants.—104 S. W. (2d) 265.

Division Two, April 21, 1937.

*E. M. Zevely, J. P. Peters* and *E. W. Allison* for appellants.

*Irwin & Bushman, Harry L. Buchanan* and *J. Ellis Walker* for respondents.

954

WESTHUES, C.—Respondents, plaintiffs below, filed this suit against appellants to contest the validity of the last will and testament of Margretta Arendall, deceased. A trial resulted in a verdict and judgment for plaintiffs setting aside the will, whereupon defendants appealed. The estate of the deceased consisted of a small tract of real estate, cash and notes of the value of approximately $14,000.

Plaintiffs are the nephews and nieces of the deceased and as such were legal heirs. The defendants are the beneficiaries under the will. Plaintiffs alleged three grounds as reasons for contesting the validity of the will: First, improper execution; second, mental incapacity on the part of the testatrix; third, undue influence and fraud. The third ground was not submitted to the jury but withdrawn for consideration by an instruction. At the close of all the evidence the defendants offered a general demurrer which was by the court overruled. Defendants thereupon offered instructions submitting the case to the jury upon the questions of the mental capacity of testatrix and the legal execution of the will. If plaintiffs, the contestants, made a submissible case upon either theory then the trial court properly overruled the general demurrer offered by the proponents. We have concluded that the evidence justified the submission of the case to the jury upon the theory that testatrix' signature to the will was not properly attested by two

witnesses as the law required. Since the will itself has a bearing upon this question we are setting forth the following photostatic copy thereof:

In the name of God Amen

I, Margretta Arendall of the County of Osage in the state of Missouri. Age Seventy Eight years, being of soundmind, do make andpublish this my last Will and Testament, as follows.

1st. I request that( $1000.00) one thousand dollars be used for my funeral and putting a grave stone to my grave as near as can be like that at John Arendell grave as possible , as the first used. Mettle Casket and Vault just like John Arendells.

2nd. that there be (-$500.00) Five hundred dollars be put on deposit in the .......... bank and that only the Intrust be used for Liberty cemetery purposes.

3rd, That ($500.00 ) Five hundred Dollars be put on deposit in the ..........Bank and the Intrust only be used for Liberty Church purposes.

4th. That Sarah E.Mathews.My Sister be paid ( $50.00) Fifty Dollars.

5th. That Sam L.Liclider be the undertaker and to see to all of my affairs and to attend to all settlements and handeling of all my papers after my death, and to be disposed of by handing the notes of the good payers to them withsout any payments on them and counted as paid.

6th. that a Deed to my home which is already made be handed to................................., have and hold as her own witho out cost to her,After my buryal,

In witnesswhereof I have hereunto subscribed my name, this the..................day of November A.D. 1927

Margretta Arendall

The foregoing instrument was at the date thereof signed by Margretta Arendall ............And declared by the said Margretta Arendall to her last will and Testament, in the presence of us who at her requestant, in her presence, and in the in the presence of each other, have subscribed our names as witnesses thereto.                    Margretta Arendall

Witness

The will was prepared by A. J. Woffórd, a notary public in Belle, Maries County, Missouri, whose signature and certificate appears on the second page of the will. Wofford was a witness at the trial and testified that he wrote the will on a typewriter while the testatrix was present in his office, on the 26th day of November, 1927. He explained that the year on the will appearing as 1027, was a typographical error. He was asked why the word "Belle," the name "Ollie E. Branson," the date in the body of the will and the name of the testatrix in the attestation clause were written with pen and ink. His answer was that he did not remember. It will be noted that the will appears to have been signed by the testatrix under the attestation clause, and 'that her name also appears immediately at the end of the will itself. Wofford's explanation of this was that he had signed his name as notary public where the testatrix should have signed and testatrix signed under the attestation clause; that when the mistake was discovered he pasted a slip of paper over his name and then testatrix signed her name on the slip. The name of 'the testatrix below the attestation clause was written with black ink while all the other writing appears in blue ink. A handwriting expert testified that in his opinion the words "Belle" and "Ollie 'E. Branson," were in a different handwriting than the name "Margretta Arendall" in the attestation clause; and that this handwriting was also different from the handwriting of the name "A. J. Wofford" on the second page of the will.

It was conceded at the trial, as here, that witness J. H. Travis did not sign the will in the presence of the testatrix, nor did the testatrix sign in the presence of this witness. It was conceded that Wofford took the will to Travis some distance away, several hours after the will had been signed, to have Travis sign his name as a witness. Wofford testified that he informed testatrix it was necessary to have two witnesses, and she informed him that she wanted

Travis to be a witness. Proponents of the will contend that Wofford may be considered a witness even though he certified as a notary public. Contestants argued that Wofford was not a witness, never intended to sign as such, was not requested to be a witness and, therefore, cannot now be considered a witness. When the will was probated Travis was presented as a witness, but the probate court rejected him when he learned that Travis was not present when testatrix signed the will. The probate court, however, admitted the will to probate upon the theory that Wofford had legally witnessed the execution of the will. Mrs. Bessie Wofford, wife of the notary public, signed the will as a witness. It is conceded that she performed the functions required of a witness to a will. At the trial Mrs. Wofford testified on cross-examination as follows:

"Q. Your husband told her she would have to have two witnesses? A. Yes, sir.

"Q. And she asked you to be one, and said to get Jess Travis to be the other one? A. Yes sir.

"Q. And your husband went and got him? A. He went and took that to him, and had him to sign it. . . .

"Q. But you are certain she wanted you and Travis to sign it as witnesses? A. Yes sir."

We may state, from what occurred at the time of the purported execution of the will and at the time it was probated, that the notary public, Wofford, was under the impression that only two witnesses were necessary to a proper execution of the will. It also appears that Wofford thought Travis had legally witnessed the will in question even though he was not present at the time the testatrix placed her signature thereto. The probate judge to whom the will was presented for probation testified as follows:

"Q. Judge, who do you say brought that will to your office? A. There were four in the party I believe. Who actually conveyed the will, I don't know, but Mr. Licklider, Mr. Wofford, Mrs. Wofford and Mr. Travis.

"Q. Now, who were offered at that time as witnesses to the will, and used as witnesses? A. Well it seems like there was three. There had been a discussion and they came up and the question was asked—Travis was asked if he signed in the the presence of the testatrix, and he said no, and I believe Mr. Wofford testified he had not, they produced Mr. Wofford and he testified the same thing.

"Q. Did you reject Travis as a witness to the will? A. Yes sir.

"Q. Did they go and employ an attorney and put Wofford on to prove in place of Travis? A. I don't think I rejected it, as soon as they found out that was a fact, they never tried to qualify him as a witness.

"Q. And then they came back with Wofford? A. Yes sir."

Taking into consideration all that occurred at the time the purported will was drawn and signed, the action of the parties at that time and what transpired when the will was offered for probate, it may be reasonably inferred that the testatrix did not intend that Wofford should be one of the witnesses to the execution of her will; also that Wofford did not at the time have the intention of signing as a witness. Proponents of the will argue that if Wofford saw the testatrix sign her name, and if he, Wofford, even though not requested to do so, placed his official seal and signature to the instrument as a notary public, that was sufficient to satisfy the requirement of the law and he should be considered as a legal witness.

A witness to a will, however, must do more than merely witness the corporal act of the signing of the will by the testator. By his signature a witness declares that testator is mentally capable of making a will. Murphy v. Murphy, 24 Mo. 526; 68 C. J. 673, sec. 316:

"It is also the duty of the witnesses to see that no fraud is committed on the testator and that the act of the testator is his free and voluntary act."

In Odenwaelder v. Schorr, 8 Mo. 458, 1. c. 465, the St. Louis Court of Appeals, quoting in part from an English case, said:

" 'One who puts his name as a witness to the execution of a will,' as is remarked by Judge Redfield (Redf. on Wills, 95, sec. 5, note), 'whilst he was conscious that the testator was not in possession of his mental faculties, places himself very much in the same attitude as if he had subscribed a will which he knew to be a forgery;' and the testimony of one who has solemnly attested the disposing mind of the testator, by setting down his name as a witness to his will, will necessarily be received with suspicion when he afterwards testifies that the devisor did not understand what he was doing. It is the business of the subscribing witness, not merely to attest the corporal act of signing, but 'to try, judge, and determine whether the testator is *compos* to sign.' "

If that be the law, of which there can be no doubt, how can a person discharge the duties of a witness to a will when he has not been requested to do so by the testator, and when such person at the time of the execution of the will did not intend or have in mind to sign as a witness? It seems imperative that before a person can legally be a witness to the execution of a will he must at least be conscious of the fact that he is such a witness at the time of its execution. This theory is supported by good authority. The Supreme Court of Iowa in the case of In re Hull's Will, 89 N. W. 979, passed upon this question. The facts were almost identical with the facts in the case before us. The will had been signed by two witnesses and there was doubt whether one of these had sufficiently witnessed the will.

The scrivener, a notary public, had certified to the execution of the will. The court said:

"It seems to be settled that if the testator asks a person who is competent to be a witness, but also is competent to take acknowledgments, to attest the will, and the person thus requested, instead of attesting the will in the usual way as a witness, affixes his certificate of acknowledgment thereto, the will is nevertheless sufficiently witnessed by him. The important fact is whether he signed as witness under circumstances rendering his attestation proper. . . .

"But the difficulty about treating Smith as a witness is that it does not clearly appear that he was asked to witness the execution of the will, or that he affixed the acknowledgment with the knowledge of the testatrix that he was signing it as a witness."

The trial court had held that the will was properly executed and the court said as to this:

"If these questions of facts had in this case been submitted to a jury, and the verdict had been for proponent, we might have thought the evidence sufficient to sustain the verdict; but we are not willing to say that the evidence as it appears in this record would sustain no other conclusion. Therefore the trial court erred in charging the jury that the will was sufficiently executed and attested, provided they should find the testatrix to have been of sound mind."

The Supreme Court of Washington in the case of In re Jones' Estate, 101 Wash. 128, 172 Pac. 206, l. c. 207, had the following comment to make:

"There are authorities which hold that a witness, intending to sign as such, may subscribe in any way intended to identify himself as a witness. [In re Walker's Estate, 110 Cal. 387, 42 Pac. 815, 30 L. R. A. 460, 52 Am. St. Rep. 104; 30 Am. & Eng. Encyl. Law (2 Ed.) 601.] But the authorities are uniform that the witness must sign *animo attestandi*. [Keely v. Moore, supra; Burton v. Brown (Miss.), 25 So. 61; Peake v. Jenkins, 80 Va. 293; Boone v. Lewis, 103 N. C. 40, 9 S. E. 644, 14 Am. St. Rep. 783; Moale v. Cutting, 59 Md. 510.]"

Our own court in the case of Ray v. Walker, 293 Mo. 447, 240 S. W. 187, l. c. 191 (2), had the following to say:

"The testator must know he is signing his will, and he must know that the subscribing witnesses are attesting his signature thereto as his will. He must in some manner request their signatures. [Bingaman v. Hannah, 270 Mo. 612, 626, 194 S. W. 276; 40 Cyc. 1115.]"

There may be authority that a person can be considered to have witnessed the execution of a will, even though not requested and even though the person did not at the time have in mind that

he was acting as such, but it seems to us that such a rule destroys the very purpose of the statute.

A number of the cases cited by appellants, however, do not so hold. Take for example the case of Kelly v. Moore, 196 U. S. 38, 49 U. S. (L. Ed.) 376, also referred to and cited by the Supreme Court of Washington in the case of In re Jones' Estate, supra. The testator in that case went to the official for the very purpose of having that official certify that the testator had signed and executed a will. In that case the law of the land did not require the testator to sign in the presence of the witnesses. It was sufficient if the testator acknowledged his signature before witnesses. The court merely held that because the witness certified, as an official, to the fact that testator acknowledged his signature did not vitiate the attestation. So in that case the request by the testator and the intent to act as a witness were present. Appellans have also referred us to the notes on cases in 8 American Law Reports, page 1077. A quotation therefrom will disclose the trend of the opinions there discussed. It will be noted that the rule there announced is not in conflict with our ruling here. Note the following:

"In other cases the intent with which the official acted is held to be the determining factor. If the officer intended to act as a witness, and added the certificate of acknowledgment in the belief that it would give greater validity to his attestation, the officer has been held to be a sufficient witness. [Murray v. Murphy (1860), 39 Miss. 214; Bolton v. Bolton (1914), 107 Miss. 84, 64 So. 967.] A request by the testator to a county clerk, to whom the testator had taken his will after it had been signed by testator and other witnesses, 'to authenticate it,' was treated as a request to witness it, and the attestation by the clerk was held sufficient, although the clerk took the testator's acknowledgment of his signature to the paper, and attached a certificate of acknowledgment, and signed the same with his official signature. [Franks v. Chapman (1885), 64 Tex. 159.]"

Had testatrix in this case requested Wofford to sign the will as a witness, and had he in response thereto signed in his official capacity, under the impression that so signing would add solemnity to the will, we would be persuaded to hold that the will was sufficiently witnessed and treat the certificate of the notary as superfluous. Appellants introduced evidence to support that theory. On the other hand contestants introduced evidence to the contrary and the circumstances support the contestants. The manner in which the will was signed lends weight to the contestants' argument. Why did the scrivener, a number of hours after the will had been signed by testatrix, go to the home of Travis and have him witness the will. Was Wofford under the impression that the will had not been properly witnessed by two witnesses? Wofford also testified that he meant to certify what had occurred with reference to the purported

execution of the will. If so, he certified that the testatrix signed in the presence of witness Travis, and Travis signed in the presence of testatrix, which was admittedly not true. Again, only two witnesses were necessary and testatrix had been so advised by Wofford. Yet testatrix insisted that Travis be one of these witnesses. Mrs. Wofford was the other. The jury were justified in finding that the offering of Wofford, as a witness at the probation of the will, was an after-thought when it was found that Travis had not properly witnessed the signature of testatrix. An expert testified that the handwriting in the will and the signature of Wofford were not the same. The photostatic copy supports this evidence. Who was the other party who filled in some of the blanks? Where was it done? Wofford and his wife testified that testatrix was the only other person present when the will was written. Why the different color ink and the various handwritings? The trial court was, therefore, justified in submitting to the jury the question of whether the will had been properly executed, and in submitting to them the question of whether or not Wofford in fact signed as a witness. This, as the Supreme Court of Iowa held, was a question of fact for a jury. The verdict was supported by substantial evidence and we are bound by that finding.

We need not decide the question of whether contestants made a submissible case on the theory of mental incapacity. Proponents did not seek to have this issue withdrawn from the jury's considera-tion. The general demurrer offered by them at the close of all the evidence did not present this question to the trial court. In-structions were submitted by appellants upon that issue and, there-fore, the sufficiency of the evidence on the question of mental in-capacity of testatrix is not before us for review.

Appellants urged that the trial court erroneously permitted two doctors to express their opinion of testatrix' sanity, based upon hypothetical questions. It is argued that these questions were im-proper and not supported by evidence. Contestants produced evi-dence that testatrix and her husband, who died many years before testatrix, accumulated what property testatrix possessed by hard labor and economic living; that during the last years of testatrix' life she often said that those who had borrowed money from her would not be compelled to pay the notes at her death if they paid the interest promptly during her life. It was contestants' position that this idea of testatrix was so inconsistent with her previous habits of life that it tended to prove that she was suffering with a mental abrasion classified as mono-mania. Contestants also argue that the provisions of the will were unnatural; that this fact tended to establish mental incapacity, considering the testatrix' previous habits of life. It will be noticed that the will provided for a can-cellation of the notes representing amounts due her from various

parties. The inventory shows a number of these. About a year after the execution of the will, S. G. Licklider, who was directed by the will to be the undertaker and to return the notes to the debtors, borrowed $4000 from testatrix. This note had not been paid at the death of testatrix. By the provisions of the will S. G. Licklider, who was not related to testatrix, was the largest beneficiary because of this unpaid note, yet he could not have been thought of at the time of its execution. These matters and many others were embodied in the hypothetical questions propounded to the doctors. We are of the opinion that the questions fairly embodied the evidence produced at the trial. The complaints made in the brief, that the questions were improper and not supported by evidence, must, therefore, be overruled.

Finding no reversible error the judgment is affirmed. *Cooley* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.