Sarah STRAHL, Lois Garland Axeman and Charles E. Garland, Appellants,

v.

Byrd C. TURNER, as an individual and as Executrix of Estate of Charles E. Turner, deceased, Respondent.

No. 45946.

Supreme Court of Missouri, Division No. 2.

March 10, 1958.

Arkley W. Frieze, Vernie Crandall, Frieze & Crandall, Carthage, Ray E. Watson, Watson & Tudor, Joplin, for appellants.

Roy Coyne, Max Patten, Joplin, Frank R. Birkhead, Carthage, for respondent.

STOCKARD, Commissioner.

This is an appeal by the contestants from a judgment sustaining the will of Charles E. Turner in which he named his wife, who

is respondent here, as the sole beneficiary. The amount in dispute is the difference between the value of the estate and what the respondent would receive as widow if there were no will, which is considerably in excess of $7,500. Jurisdiction of this appeal is in this court.

The Turner family operated a store for many years in Carthage, Missouri, dealing in furniture, carriages and harness. The business was dissolved in 1932. Thereafter, Charles E. Turner was "more or less" retired and he engaged in making loans, mostly on real estate. His first wife died in 1941 after they had been married about forty years. Respondent formerly lived in Carthage, but she and her first husband went to California in 1912. Her husband died in 1939, and after some correspondence she and Mr. Turner were married in August 1944. The contested will was signed by Mr. Turner on October 9, 1951, when he was a few months less than 79 years old. He died on April 22, 1954, leaving no lineal descendants. The contestants are the direct descendants of Mr. Turner's deceased brother and sister.

The case was submitted to the jury on the issues of the testamentary capacity of Mr. Turner, the mental capacity of S. I. Barton to act as an attesting witness to the will, and undue influence on the part of respondent. The verdict of the jury was to sustain the will.

Appellants' first two contentions, which we shall consider together, are that instruction 1, the principal verdict directing instruction, was erroneous because it failed to require the jury to find that Lottie R. Barton was a competent witness to attest the will, and that the court also erred in refusing their requested instruction 19 submitting that issue to the jury. We need not set out instruction 1 because it is not challenged except on the basis that it failed to submit the issue sought to be submitted by instruction 19, which was as follows: "The Court instructs the jury that if you find and believe from the evidence that at the time

of the signing of the paper writing dated October 9, 1951, by Charles E. Turner, the witness Lottie R. Barton did not observe and judge of the mental capacity of the said Charles E. Turner to make a will and did not satisfy herself that he possessed the mental capacity to make a will, then the said Lottie R. Barton was not a competent witness to said paper writing and you will return a verdict that said paper writing is not the last will and testament of the said Charles E. Turner, deceased."

It will be helpful to set out the circumstances surrounding the execution of the will. On October 9, 1951, at Mr. Turner's request, respondent called Mr. S. I. Barton, a practicing attorney in Carthage, and requested that he come to the Turner residence. Mr. Barton talked to Mr. Turner and obtained information concerning the desired contents of the will. He returned to his office and prepared the will and had it typed by his secretary. He then called his wife, Lottie R. Barton, and took her with him to the Turner residence. There is no question but that Mrs. Barton knew and understood that the purpose of her accompanying her husband to the Turner residence was to act as an attesting witness at the execution of a will. Mrs. Barton testified that after Mr. Turner and Mr. Barton "passed a few words together"—"just like a few greetings," they then "got down to business," and that by this she meant "reading the will over." To her best recollection Mr. Turner read the will aloud. Mr. Barton and Mr. Turner talked some about the will and "about some other things, too," but Mrs. Barton did not remember the conversation because she "wasn't paying much attention" but was "looking at a magazine," and she "thought they were attending to that business." They "seemed" to speak about the will and the things in it. The copy of the will had been typed when Mr. Barton took it to the Turner residence, but at the suggestion of Mr. Turner, the name of respondent, as it appeared in the will, was changed to include her middle initial "C." Mr. Barton told his wife "to come

and see him sign the will—watch him sign the will." Mr. Turner then signed the will in the presence of both Mr. and Mrs. Barton, and they each then signed as witnesses in the presence of him and in the presence of each other. Mrs. Barton was asked this question: "Now Mrs. Barton, from your observation, language, the conversation, the conduct and demeanor of Mr. Charles E. Turner on that occasion, will you tell the jury whether or not, in your opinion, at that time he was of sound mind?" Mrs. Barton was permitted to answer, over the objection of appellants, that, "Yes, he was of sound mind from all of my observation." Mrs. Barton was also permitted to testify over appellant's objection, that "(h)e [Turner] seemed to understand everything he had anything to say about."

We should first note that the validity of the will in this case, as affected by the circumstances of its execution, is to be governed by the provisions of the probate code in existence prior to January 1, 1956. All statutory references are to RSMo 1949, V.A.M.S. Section 468.150 (now repealed but applicable to this case) and Section 474.320 (the presently existing provision) both provide that every will "shall be attested by two or more competent witnesses subscribing their names to the will in the presence of the testator." The present code contains a new provision, Section 474.330, which was not in effect prior to January 1, 1956, and which provides that "(a)ny person competent to be a witness generally in this state may act as attesting witness to a will."

■ We should next note that whether the test of the competency of a person to be an attesting witness to a will be the same as or different from the test of competency of a person to be a witness in a judicial proceeding, the rules pertaining to who makes that determination are not the same. In the case of the competency of the witness to testify in a judicial proceeding the question is for the court. Ashley v. Williams, 365 Mo. 286,

281 S.W.2d 875; 97 C.J.S. Witnesses § 119b. The competency of a witness to attest a will is a mixed question of law and fact. It is a question of law as to what constitutes a competent witness to attest a will, but the existence of the particular facts affecting competency is for the jury. 95 C.J.S. Wills § 458. Therefore, assuming that there was substantial evidence to authorize the submission to the jury of the issue whether Mrs. Barton did not observe and judge the mental capacity of Mr. Turner to make a will, a close question under the evidence in this case, were the appellants entitled to have this issue submitted to the jury? In other words, if Mrs. Barton did not in fact "observe and judge" the mental capacity of Mr. Turner and "satisfy herself that he possessed the mental capacity to make a will" would she then, as a matter of law, not be a competent witness within the meaning of Section 468.150 (now repealed) to attest the will?

■ In the absence of a statute defining the term, a "competent witness" for the purpose of attesting a will has been defined to be a person who is legally competent at the time of the execution of the will to testify in a court of justice to the facts which he attests by subscribing his name to the will. 57 Am.Jur., Wills, § 308; 1 Page, Wills, (Lifetime ed.) §§ 312, 313; In re Charles' Estate, 118 Neb. 634, 225 N.W. 869, 64 A.L.R. 1299; Salyers v. Salyers, 186 Va. 927, 45 S.E.2d 481; In re Mitchell's Estate, 41 Wash.2d 326, 249 P.2d 385. As stated in 94 C.J.S. Wills § 185, "(g)enerally speaking, all persons are competent as witnesses to a will who are legally competent to be sworn and able to testify in a court of justice to the facts to which they attest in subscribing their names to the will. In other words, such persons are competent as witnesses to a will as are not legally disqualified to testify in a court of justice, as by reason of mental incapacity, interest, the commission or conviction of a crime, want of religious belief, or other causes excluding them from testifying generally, or

rendering them incompetent in respect of particular subject matter or in the particular suit."

■ There is no contention that at the time Mrs. Barton acted as an attesting witness she was not legally competent to be sworn and to testify in a court of justice to the facts that she observed and to the things that she did. Appellants admit in their brief that Mrs. Barton was "competent *to be* a witness" to the will, but they contend that she was not in fact a competent witness to the will because she did not observe all that she could have observed, and it is their contention that this circumstance would authorize a finding by the jury that she did not in her own mind satisfy herself that the testator was mentally competent to make a will, or in other words, that he was a person "of sound mind."

■ The fallacy of appellants' contention is that the matters in which appellants claim Mrs. Barton was deficient in acting in the capacity of an attesting witness do not affect her competency to act as an attesting witness to the will, but bear only on her credibility as a witness in the suit to contest the will. As stated in 1 Page, Wills, (Lifetime ed.) § 312, "(t)he fact that a subscribing witness has been impeached does not render the will invalid; no matter what effect it may have upon the weight to be given to his evidence."

■ Appellants rely primarily on statements made in Withinton v. Withinton, 7 Mo. 589; Baxter v. Bank of Belle, 340 Mo. 952, 104 S.W.2d 265; Dunkeson v. Williams, Mo.Sup., 242 S.W. 653, and Knapp v. St. Louis Trust Co., 199 Mo. 640, 98 S.W. 70, to the effect that there is a duty on an attesting witness to try, judge and determine whether the testator is mentally competent to execute a will. In none of these cases was the precise question here presented before the court. We do not in the least question that a person should not act as an attesting witness when he has any reason to believe the testator

is not mentally competent. But if he does, that fact does not destroy his competency as an attesting witness. Because of the different factual situations involved, and because the precise issue here presented was not before the courts, we are of the opinion that the above cited cases are not authority in support of appellants' contention in this case. But, insofar as it may be contended that they do constitute such authority by reason of the language used, they should no longer be so considered.

As far as we have been able to determine, the precise issue here presented has not previously been before the courts of this state. In Spencer v. Spencer, Mo.Sup., 221 S.W. 58, 62, the issue pertained to the testamentary capacity of the testator. An attesting witness testified that he "did not know whether he (testator) was mentally strong or mentally weak; that he seemed all right when the will was signed." There was no challenge of the competency of the witness. This court stated, admittedly by way of dictum but we believe correctly, that "(w)e do not think the law required the witness to a will to make any special examination of the testator to determine his mental condition or whether at the time he may not be suffering from some mental ailment, weakness, or aberration." The precise issue has on a few occasions been before the courts of other states, and in each case that we have found, with the exceptions hereafter mentioned, where the issue was directly presented it has been ruled that the failure of the attesting witness at the time of the execution of the will to observe and judge the mental capacity of the testator did not result in him being incompetent to act as a witness. See In re Mitchell's Estate, 41 Wash.2d 326, 249 P.2d 385, where the statutory provisions are substantially the same as those of this state, and where the question is discussed at considerable length. See also In re Paradis' Will, 147 Me. 347, 87 A.2d 512; In re Zych's Will, 251 Wis. 108, 28 N.W.2d 316; In re James' Estate, 140 Fla. 463, 191 So. 830; Huff v. Huff, 41 Ga. 696, Canada's

Appeal, 47 Conn. 450; Baxter v. Abbott, 7 Gray, Mass., 71; Mordecai v. Canty, 86 S.C. 470, 68 S.E. 1049.

In Scribner v. Crane, 2 Paige, N.Y., 147, 21 Am.Dec. 81, it was stated that the "witness should also be satisfied, from his own knowledge of the state of the testator's mental capacity, that he is of sound and disposing memory," and after holding that neither attesting witness had sufficient knowledge of the testator's mental capacity to give legal evidence of the due execution of the will, the will was rejected. However, it is to be noted that in this case there was not sufficient evidence from other witnesses to sustain a finding of testamentary capacity. In Allison v. Allison, 46 Ill. 61, 92 Am.Dec. 237, a will was rejected because a subscribing witness had formed no judgment as to the mental capacity of the testator. But, this decision was based on the declaration by the court that the Illinois statute required "before a will can be admitted to probate, that the subscribing witnesses shall swear they believe the testator to have been of sound mind and memory." Numerous cases can be found in which courts have for various reasons stated that it is the duty of an attesting witness to satisfy himself as to the testamentary capacity of the testator (see the annotation in 35 A.L.R. 79), but the above two cases (although there may be others) are the only ones we have found where for that reason the will was rejected, and we believe they are distinguishable. In 57 Am.Jur., Wills, § 302, after stating that it is the general rule that an attesting witness has the duty to judge and determine the testamentary capacity of the testator, it is further stated that such rule "has its best foundation in jurisdictions where it is provided by statute that in order to entitle a will to probate the attesting witnesses must swear that they believed the testator to have been of sound mind and memory." For example, see Allison v. Allison, supra. It is then stated that "(i)n other jurisdictions, the rule that an attesting witness is under a duty to observe the mental capacity of the testator is, in some respects, honored more in the breach than in the observance, since the courts which uphold it do not carry it to the extent of invalidating a will for the reason that the attesting witnesses did not perform the duty imposed by the rule." See also a forcefully written article in 36 Case and Comment, No. 4, at page 7, where it is stated that the doctrine announced in some cases that an attesting witness must try, judge and determine the mental capacity of the testator would, if scrupulously followed, work real mischief. The effect of this situation, it is stated, "would be to repose in the witnesses the ultimate power to determine the testamentary capacity of the person undertaking to make a will, and to invest them with the highly judicial function of denying the capacity to make a will and of holding invalid the instrument attempted to be executed; and from their decision in such a case there would be no appeal." 36 Case and Comment, No. 4, at page 23. The decision or opinion of the attesting witnesses in favor of the testamentary capacity of the testator is never conclusive; therefore, their failure to make such a determination, or their determination that the testator was not competent also should not be conclusive.

■ Appellants' contention runs afoul of two other sound and well accepted legal propositions in the law of wills. First, if the attesting witness is required to judge and determine the mental capacity of the testator, apparently he would be required to do so according to the accepted standards of what constitutes testamentary capacity. In Hardy v. Barbour, Mo.Sup., 304 S.W.2d 21, at page 34, this court recently restated the time honored general rule as to testamentary capacity in this way: " ' "A testator with mind enough to understand," the ordinary affairs of life, the kind and extent of his property, who are the natural objects of his bounty, and that he is giving his property to the persons mentioned in his will, in the manner therein stated, is capable of making a will under the law of this state.' " How

could an attesting witness possibly make a determination of the testamentary capacity of the testator unless he actually knew or inquired as to the contents of the will, the names, ages, and circumstances of the testator's immediate family, and the extent of his property, and to whom he was giving his property by the terms of his will? Yet it has always been the rule in this state that a person need not know the contents of the will which he subscribes in order to be a competent attesting witness. Grimm v. Tittmann, 113 Mo. 56, 20 S.W. 664; Callaway v. Blankenbaker, 346 Mo. 383, 141 S.W.2d 810. Second, "the law does not leave a will at the mercy of the subscribing witnesses; and, even though some or all of them appear and testify adversely, the instrument may nevertheless be established by competent evidence aliunde." German Evangelical Bethel Church of Concordia v. Reith, 327 Mo. 1098, 39 S.W.2d 1057, 1061, 76 A.L.R. 604. The result of appellants' position would be that the jury would be instructed that unless it found as a fact that both attesting witnesses, at the time of the execution of the will, made a determination that in their opinion the testator was mentally competent, then the will must be rejected, even though the jury was of the opinion, based on its consideration of all the evidence, and the testator had the required testamentary capacity.

■ We agree with the conclusion of the Supreme Court of Washington, when the identical issue was squarely presented, "that while it is highly desirable that one attesting a will should observe and satisfy himself as to the testamentary capacity of the testator, it is not a duty imposed by law, the omission of which renders the will invalid." In re Mitchell's Estate, 41 Wash.2d 326, 249 P.2d 385, 396. Under the evidence in this case, the trial court did not err in refusing to submit to the jury in the manner requested by appellants, the issue of the competency of Lottie R. Barton to act as an attesting witness.

Appellants next contend that the trial court erred in refusing to give at their request instruction 18, which was as follows: "You are instructed that unless you find and believe from the evidence that both witnesses to said instrument of writing, S. I. Barton and Lottie R. Barton, signed said instrument at the request or suggestion of the said Charles E. Turner and that such witnesses were both informed by the said Charles E. Turner, at the time of signing said instrument, that they were attesting the same as witnesses of his last will and testament, or unless you find from the evidence that the said witnesses knew from the contents of said instrument that it was intended by the said Charles E. Turner to be his last will and testament, then you will find that the instrument of writing was not the last will and testament of the said Charles E. Turner."

The issues of whether the instrument which was executed on October 9, 1951, was published and declared by Mr. Turner to be his will and whether the witnesses subscribed their names thereto at his request were submitted to the jury by instruction 1, and no complaint is made as to those features of that instruction. The only argument in appellants' brief specifically directed to the contention that they were entitled to have instruction 18 given to the jury is as follows: "While it may be said that instruction No. 1 did include the formal requirements of request to witness, and publication and declaration by the testator, we feel that since these questions were specifically raised by the pleadings the offered instruction No. 18 on that specific issue should have been given and failure to do was also reversible error."

■ The burden was on appellants to demonstrate in what manner the trial court erred, and obviously they have not done so. However, the requested instruction was erroneous under the evidence in this case. An attesting witness need not know the contents of the will, Callaway v. Blankenbaker, 346 Mo. 383, 141 S.W.2d 810, and the request to the witnesses to attest the will and

the publication of the will by the testator need not be made by express words, but may be by acts, signs or conduct and may be inferred from the circumstances. See Lohmann v. Lohmann, Mo.Sup., 216 S.W. 518; Clark v. Crandall, 319 Mo. 87, 5 S.W. 2d 383; Look v. French, 346 Mo. 972, 144 S.W.2d 128. The jury was so instructed by instruction 1. The evidence in this case indicated that there probably was no verbal publication of the will to Mrs. Barton by the testator in express words, and that there was no express oral request by the testator to Mrs. Barton to act as an attesting witness. However, the acts and conduct of the testator, and the attending circumstances, certainly authorized a finding by the jury according to the provisions of instruction 1 that there was a publication of the will and a request by Mr. Turner to Mrs. Barton to sign as an attesting witness within the meaning of the above cited cases. Instruction 18, on the other hand, would give a reasonable jury the impression that before it could render a verdict sustaining the will it had to find that the testator orally requested both witnesses to attest his will and that he orally told them that they were attesting his will, or that the witnesses knew that the instrument was his will because they knew the contents of it. See Palm v. Maguire, 347 Mo. 189, 146 S.W.2d 636, for a remarkably similar factual situation.

■ Appellants also assert that the trial court committed reversible error in refusing to sustain their challenge for cause to Jimmy Hicks as a juror. They contend that they were prejudiced in being required to use one of their peremptory challenges in order to remove him from the panel. See Moore v. Middlewest Freightways, Inc., Mo.Sup., 266 S.W.2d 578.

The testimony on voir dire examination, which we shall set out in detail, disclosed that Mr. Hicks was then and had been an employee of the Central National Bank for about three years; that he knew the respondent by reason of her being a customer of the bank; and that he also knew Mr. Turner during his lifetime. Mr. Hicks stated that he had heard about the case, but had not heard it discussed enough to have formed an opinion regarding it. He also stated that he knew that three officers of the bank were to be witnesses, and that although "we have talked about it," they had not gone into the details of the case. He was then asked if he could give "the plaintiffs and the defendant a fair trial" and he replied "(w)ell I think so" and "I would try my best." He stated that the fact that he knew respondent would not influence him, and that although he knew Mr. Turner intimately, he had not visited at his house, and "wouldn't be for or against" either party and that there was nothing in his acquaintance with Mr. Turner which would prejudice him one way or the other.

Mr. Hicks had not heard Mr. Pahlow, a vice-president of the bank or Mr. Evans, the president, make any comments about the case. When asked what officers at the bank he had heard discuss the case he answered, "(w)ell, Mr. Swarens." Mr. Hicks was then asked if the fact that Mr. Pahlow and Mr. Swarens would testify would have any effect or influence upon him as a juror, and if he would pay any more attention to what they might say. His answer was, "(w)ell, I don't think it would. Of course, it is just the fact that I have worked around them. I mean, I don't think it would prejudice me. I don't think I would go their way any stronger than the other, except for the fact I have * * *." He was then interrupted by counsel for appellants who stated, "(w)ell you are there and hobnob around with them every day." Mr. Hicks replied, "I work with them; I am with them every day." He was then asked if selected as a juror, it would in any way embarrass him that "two of the top officials" at the bank were witnesses in the case, and he replied, "(n)o, I don't think that would make any difference."

Appellants' challenge of Mr. Hicks for cause was overruled. The basis for the challenge was stated to be (1) that he is an employee of the Central National Bank, (2) Mr. Pahlow, who is vice-president of

the bank, has been subpoenaed as one of the defendant's witnesses, (3) Mr. Swarens is also a witness in this case, (4) Mrs. Turner is a customer of the bank, and (5) "I think the evidence will develop, Your Honor, some other matters that the bank is interested in in connection with this case."

"The trial judge is and should be vested with broad discretion in determining the qualifications of veniremen to sit as jurors and his rulings should not be disturbed unless they are clearly and manifestly against the evidence." Moore v. Middlewest Freightways, Inc., supra, 266 S.W.2d 585. See also, Cleghorn v. Terminal Railroad Ass'n of St. Louis, Mo.Sup., 289 S.W.2d 13; Rose v. Sheedy, 345 Mo. 610, 134 S.W.2d 18. In reference to the cases cited by appellants in support of their contention, Mr. Hicks did not admit any prejudice against a party to the action, as in Carroll v. United Railways Co. of St. Louis, 157 Mo.App. 247, 137 S.W. 303, or against a class of which the party challenging the juror was a part, as in Moore v. Middlewest Freightways, Inc., supra, and in Theobald v. St. Louis Transit Co., 191 Mo. 395, 90 S.W. 354. There is no contention that Mr. Hicks did not make a full disclosure of the facts, as in Piehler v. Kansas City Public Service Co., 357 Mo. 866, 211 S.W.2d 459, and he was not an employee of a company which could be affected adversely by the result of the case, as in Murphy v. Cole, 338 Mo. 13, 88 S.W.2d 1023, 103 A.L.R. 505. While the trial court, and not Mr. Hicks, was the judge of his qualifications as a juror, Piehler v. Kansas City Public Service Co., supra, he did affirmatively state that the facts forming the basis of the challenge would not result in prejudice on his part, and that they would not prevent him from acting impartially.

In 50 C.J.S. Juries § 221a(1) there are enumerated several relationships of prospective jurors which the courts have held, standing alone, do not constitute a valid ground of challenge for cause, one of which is "because of professional relationship with a witness for one of the parties."

See also United States v. Sferas, 7 Cir., 210 F.2d 69, certiorari denied, Skally v. United States, 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086, where it was held not to be an abuse of discretion for the trial court to refuse to withdraw a juror who was a fellow employee of an expert witness for the government. Under the circumstances here, with no more showing than that made, we must necessarily conclude that it was not an abuse of discretion on the part of the trial judge to refuse to sustain the challenge to Mr. Hicks for the reasons advanced.

Appellants' next contention is that the trial court erred in admitting in evidence over their objecton a list of divorce cases filed by S. I. Barton in the circuit court of Jasper County during the calendar years of 1951 and 1952, and in admitting in evidence over their objection copies of nine wills filed in the probate court of Jasper County which S. I. Barton had signed as an attesting witness. A recitation of the circumstances under which these exhibits were admitted is necessary.

In support of their contention that Mr. Barton was not mentally competent on October 9, 1951, to act in the capacity of an attesting witness, appellants called as a witness Harold Jones, the clerk of the circuit court of Jasper County, who testified that in his opinion during 1950 and 1951 Mr. Barton was of "unsound mind." As a basis for this conclusion he related that at one time in 1951, Mr. Barton had either been appointed or hired to represent "a criminal" and that when the trial was about to begin "this criminal went to the Bench and asked for a continuance" because Mr. Barton could not remember his name and did not know what he was charged with. He also stated that Mr. Barton told "little parlor jokes" and kept repeating them, and Mr. Jones also related some instances which indicated that Mr. Barton was confused while handling his cases in court. He specifically stated that in reaching his opinion that Mr. Barton was not of sound mind he had taken into consideration that during

1950 and 1951 Mr. Barton would sometimes go to people in the audience in the courtroom and ask them their names because he did not recognize his client. On cross-examination Mr. Jones was asked if Mr. Barton had filed a large number of divorce cases in 1950 and 1951, and he replied that he had, and that he was considered to be "more or less of a specialist" in handling divorce cases. Respondents then had exhibit E marked for identification which purportedly contained a list of 159 divorce suits filed by Mr. Barton in the circuit court of Jasper County during 1950 and 1951 in which divorces were obtained. Mr. Jones was then asked to verify from his records, after he left the witness stand, that the list of divorce cases was correct, and he was told that he would be recalled to report on the result of his investigation. No objection was made by appellants. Exhibit E was not then offered in evidence. Mr. Jones was subsequently recalled to the witness stand by appellants, and respondent then asked him if he had checked the list of divorce cases, and he replied that he had, and that the list was correct except for one divorce which "was set aside." This one case was not identified and no explanation was made. Respondent then offered in evidence exhibit E, to which appellants objected because "it doesn't show anything about the competency of Mr. Barton, the mere fact that he got any number of divorces."

We shall turn now to the circumstances of the admission in evidence of the copies of wills to which Mr. Barton had acted as an attesting witness. One of the witnesses for respondent was Judge Mallett, the probate judge of Jasper County. He identified the will of Mr. Turner, stated that he was acquainted with Mr. Barton and with his signature, that one of the signatures on the will was that of Mr. Barton, and that in his opinion Mr. Barton was sane on October 9, 1951, the date of the execution of the will. Judge Mallett then testified that Mr. Barton continued to practice probate law in his court, that "he probated estates, acted as guardians and as attorneys for guardians, and attorneys for estates, came in to witness wills, up to and including the first of 1955." After appellants had offered their evidence that Mr. Barton was not mentally competent, a substantial portion of which was to the effect that he was not able to carry on properly his normal business, Judge Mallett was recalled to the witness stand by respondent, and at that time he identified nine different wills which had been filed in his court. Appellants objected to Judge Mallett stating who the witnesses were to the wills because "it doesn't prove or disprove any of the issues in this case." This objection was overruled, and Judge Mallett identified the signature of Mr. Barton on each will where he had signed in the capacity of an attesting witness. The earliest will was dated April 22, 1949, and the latest was dated March 3, 1953. Six of these wills were offered for probate during the life of Mr. Barton, and Judge Mallett testified that in his opinion when Mr. Barton appeared personally in his court in connection with the probate of these six wills he was of sound mind. All the wills, although separately marked as exhibits, were then offered in evidence as one group. Appellants stated, "(w)e renew our same objection." The trial court overruled this objection and admitted the wills in evidence, but he stated to the jury that the substance of those wills had nothing to do with the case, and that they were admitted "only for the purpose of showing the signature and showing that they were witnessed by S. I. Barton."

Appellants cite three cases in support of their contention that the admission of this evidence was reversible error. However, these cases are not in point. Martin v. Springfield City Water Co., Mo.App., 128 S.W.2d 674, was a suit for negligence. As to evidentiary matters, it pertained only to the correctness of a hypothetical question asked a witness when the evidence in support of some of the facts hypothesized was not admitted until after the question was asked, and whether there had been

sufficient proof of the signature on a certain exhibit admitted into evidence. Albertson v. Wabash R. Co., 363 Mo. 696, 253 S.W.2d 184, was a suit for injuries occurring at a railroad crossing. The only evidentiary question was whether a pleading filed by the defendant before the Public Service Commission constituted an admissible declaration against interest. In Fosmire v. Kansas City, Mo.Sup., 260 S.W.2d 252, the plaintiff tripped over a rail of a streetcar track and brought suit against the city for negligence. The city offered in evidence two ordinances to show that at the time of the injury it was the duty of the streetcar company to repair any defects in the tracks. The court held that it was error to admit these ordinances because the duty on the city to maintain its streets was nondelegable.

Appellants sought to establish that on October 9, 1951, Mr. Barton was mentally incompetent to act as an attesting witness because he could not and did not properly conduct his legal business. Although the proceeding here was not an insanity hearing as such, the issue for determination in reference to Mr. Barton was the same. "Evidence in insanity cases is, of necessity, allowed to take a wide range. This wide latitude is made necessary by the nature of the subject. Insanity is a mental condition, not a thing which can be observed by direct contact through the ordinary senses, and its existence can only be ascertained and its extent measured through the acts, conduct, and appearance of the person affected. Any act or circumstance, therefore, which will reasonably serve to this end will be competent, and things, conduct, and circumstances, which are ordinarily rejected as too remote or circumstantial, are admitted for what they are worth." Smoot, Law of Insanity, § 543. See also I Wigmore, Evidence, (3rd ed.) § 227. In connection with the proof of mental competency to make a will, it is held that "the fact that a testator transacted his own business and managed his property is strong evidence

of testamentary capacity, but it is not conclusive." 94 C.J.S. Wills § 71. See also 94 C.J.S. Wills § 51. In 2 Page, Wills, § 795, it is stated that "evidence as to testator's ability to carry on business transactions at the time at which he is claimed to have been competent to make a will is admissible." It is evident that the trial court permitted appellants wide latitude in the offer of evidence in support of their contention that Mr. Barton was not mentally competent when he acted as an attesting witness. In this situation a trial judge must necessarily be clothed with considerable discretion in determining what evidence will be excluded on the basis that it is not material to the issue of mental competency. The usual and normal business of Mr. Barton was that of a practicing lawyer. Exhibit E showed that Mr. Barton frequently had three divorce cases tried on the same day, and that on one day he had four and on another day he had six. The jury might well find this to constitute some explanation of why Mr. Barton did not always readily recognize his client or witness in the courtroom. Also, the fact that at and near the time when he acted as an attesting witness to the will of Mr. Turner, he was also filing and handling numerous cases in court, and was acting as an attesting witness to other wills, not in an isolated case but with regularity, constituted some evidence of his mental competency. While we have some doubt as to just how persuasive this evidence would be, the trial judge did not abuse his discretion in admitting it. It was for the jury to determine under all the circumstances what value should be given to it.

█ Appellants assert that the trial court erred in refusing to permit Mrs. Pearl Holladay to testify that Riley King had approached her and had advised her "not to know anything." Riley King, a witness for respondent, was county auditor. He lived "just around the corner" from the Turner residence, and he assist-

ed Mr. Turner in some of his personal needs and also kept his books of account for him. He testified that it was his opinion that in 1951 Mr. Turner was of sound mind. He was then cross-examined at considerable length by appellants, even as to matters not covered by his direct examination. However, no question was asked him which even remotely pertained to the issue of whether he had said anything to Mrs. Pearl Holladay concerning her testimony. Subsequently, Mrs. Holladay was called as a witness by appellants, and she was asked if after the death of Mr. Turner, she "ever had any conversation with Homer or Riley King in which they approached you about what your testimony should be," and she answered, "(w)ell, I was advised not to know anything." The trial court sustained respondent's objection and instructed the jury not to consider the answer. Appellants then made an offer of proof that "this evidence is offered to show that Riley King undertook to get this witness not to remember any of the things that happened and not to testify to those things in court."

■ A witness may be interrogated as to attempts on his part to tamper with or influence other witnesses for purposes of impeachment for interest and bias. 98 C.J.S. Witnesses § 560p. Also, independent evidence may be shown for the purpose of impeachment on this basis, III Wigmore, Evidence (3rd ed.) § 960, but "(w)hile there is conflict of authority as to the necessity of laying a foundation to impeach a witness for bias or hostility, and it has been stated that it rests within the judicial discretion of a trial court whether or not to admit impeaching statements where no foundation has been laid, it is generally held to be necessary where impeachment is based on the witness' statements or declaration." 98 C.J.S. Witnesses § 566. See also Barraclough v. Union Pacific Railroad Co., 331 Mo. 157, 52 S. W.2d 998; III Wigmore, Evidence (3rd ed.) §§ 953, 964; Annotation 16 A.L.R. 984. Here the attempted impeachment

was based on statements purportedly made by Riley King to Mrs. Holladay. In Bates v. Holladay, 31 Mo.App. 162, one of the cases cited by appellants, we find this statement: "A witness may also be impeached in this state by evidence of his having attempted to suborn or tamper with witnesses subpoenaed in the particular case. * * * But to render it admissible against him for that purpose, it was first necessary to lay the proper foundation by asking him on his cross-examination whether he had not made such an attempt; since if such a charge is brought against him it is due to him that he be notified and have an opportunity to explain." Under the circumstances, the trial court did not commit reversible error in excluding the offered testimony of Mrs. Holladay.

■ Appellants' last point is that the trial court erred in permitting respondent to ask a hypothetical question of Dr. W. I. McNew who was the attending physician for S. I. Barton from 1950 until his death in 1956. He testified for appellants, and on direct examination stated, "I do not feel that Mr. Barton fully appreciated the consequences of his acts during the period of 1950 and for the remainder of his life." On cross-examination he testified in considerable detail concerning the condition of Mr. Barton, and stated that "like most people in their dotage, he remembered things that happened to him many years before—had a very vivid memory for that. But for recent events, he didn't have a very good memory for that." The following subsequently occurred on re-cross-examination.

"Q. (By Mr. Patten) Wait just a minute, now, Doctor. The evidence in this case is that on or about October 9th, 1951, that S. I. Barton witnessed a will. The evidence, further in this case shows that on or about the 4th day of August, 1954, he gave a deposition in which he very vividly accounted for a man of his age the events that occurred on October 9th, —.

"Mr. Watson: We object to the form of question, 'very vividly,' and ask that be stricken out.

"The Court: The objection is overruled.

"Q. (By Mr. Patten)—gave an account of events that happened on October the 9th, 1951. Now, then, if he was capable of doing that, doctor, you would say that he was capable of remembering the events in August of '54 that occurred on October the 9th, 1951, wouldn't you?

"Mr. Crandall: If the court please, I want to object to that because I feel that, in view of the statements he has made concerning his mental condition, as to whether or not he would remember acts at that time, is invading the province of the jury.

"The Court: Well, the objection is overruled.

"Q. (By Mr. Patten) I say, if the evidence in this case discloses that S. I. Barton, on October 9th, 1951, attested to a will, that is, that he just acted as a witness, then on August the 4th, 1954, he gave a deposition and remembered the events that transpired on October the 9th, 1951, you would say that his mentality was such that he could recall some events after they occurred of recent times, wouldn't you?

"Mr. Watson: If the court please, we want to object to that, again; it is not a fair statement of what he said. It is not a fair question.

"The Court: Well, I think it is fair examination of the doctor. The objection is overruled.

"A. In other words, what you are asking me is this: if Mr. Barton remembered in 1954—you say that he did, you have evidence that he did—that he remembered all that, I would say that there was no question about that he had pretty good memory of that event."

Appellants limit their objection to the use of the words "very vividly" in the hypothetical question. We think the trial court should have sustained the objection of Mr. Watson to the use of these words, but even though it did not, Mr. Patten reframed his question to the doctor, and before the doctor answered the question as reframed, he took it upon himself to restate what he understood the question to be. In both instances the words "very vividly," or similar words, were not used. Therefore, the appellants could not have been prejudiced by the improper words in the original question, which was not answered, and which question, before it was answered, was twice rephrased without the presence of the objectionable words.

We find no reversible error in the respects contended by appellants and, therefore, the judgment is affirmed.

BOHLING and BARRETT, C. C., concur.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All concur.